Good morning, Your Honors. If it would please the Court, my name is Martha Stringer. I represent the County of Colusa and Stephen Hackney in his official capacity as the Director of the Department of Planning and Building. The Senior County Counsel, Margaret Kemp-Williams, is here in the audience. I would ask for three minutes as well for rebuttal. This case involves crucial policy issues for California counties about the duty and the ability to regulate the land within their borders. Included within the idea of public welfare, protection of the public by the use of the land within the borders, is the idea of a county's stability, its soul, its character. And for Colusa County, that is agriculture. There are probably many people in California who have no idea where Colusa County is. If they got out of fifth grade, they might have known at one time, but they don't know now. Colusa County does not have much of a population. It's currently about 22,000 people. It doesn't have a burgeoning industrial pace. But what it does have is an abundance of prime agricultural land nestled in between the Sierra and the sea. And it is this land which it wants to preserve. It is Colusa County's ability to regulate this land, which is directly challenged by Mr. Claxton's application and now by this writ. We believe that the application was properly denied and that the writ should have been denied by the district court. It should be noted that in addition to having an application for a subdivision of land, Mr. Claxton also had a piece of paper called a development permit that is found at the record at page 60. So he was thinking of developing this land. This map of his was his plan to do so. This map was his projection of what that large chunk of Colusa County land would look like eventually. And at the time that he made this application, in 2006, 2007, his was the largest split ever suggested in the agricultural zone. I do need to say just one word about the standard of review, because Mr. Claxton, I believe, has it wrong. Your job is to look at the administrative record, to scrutinize it, and to determine if the agency made the correct decision at the agency level. You do not defer to the trial court. And in several places in his brief, Mr. Claxton referred to referring to the trial court, district court's decision. That is not the standard. Now, Colusa's general plan was written 20 years before Mr. Claxton made his application. And it is true that at that time there was a sentence that said 10 acres was a minimum lot size in the agricultural zone. But that general plan also has a great deal of specific language which says 10 acres will not support agriculture. There are very general statements about protecting farmland, protecting farmers from encroaching uses, keeping development concentrated within the, they say, cities, the really towns of Colusa and Williams. But there are very specific provisions, two of which I would call your attention to. One is that 30 acres was considered the minimum necessary to assure the preservation of farmland in Colusa, and another was that it was necessary to grow fruits and nuts, and Mr. Claxton had an almond orchard. So taken as a whole, it was clear that the Colusa County general plan intended for agricultural land to be in at least 30-acre parcels. Mr. Claxton, when he came in, had 20- and 40-acre parcels. And if you look at his history, he had a lot of parcels of land. He had a history of dividing and selling. He had a map in 2001 that had 7 large acres of land. I'm sorry, several large parcels of land. He had a map then in 2005 which divided that up into 13 different parcels, 20- and 40-acres. The 2007 application took this land and divided it into 39 small lots, 30, at least 35 of which were 10 acres. That's what he wanted. That was the only thing he would accept. The county worked and worked and worked with him to see if something could be breached, some agreement where he could make a different split that would be compatible with the general plan. It simply couldn't be done. The general plan works with the Subdivision Map Act, and the general plan provides the why for land use policies. It shows what we want in Colusa for the future. The Subdivision Map Act tells you how this can be divided. The Subdivision Map Act says you, county, must deny an application if it's inconsistent with your general plan and with the general objectives and purposes of that plan. And that's what was determined by Colusa County. It was not, Mr. Claxton's application was not compatible with those plans and objectives that were set out so clearly in the general plan. Roberts. Let me ask you, I want to make sure I understand the chronology of this. He filed an application before the resolution in question was passed. He did. The resolution that was ultimately the basis to deny the application. Is that at least in part? In part. I certainly agree that he, he filed his application before the resolution passed. Okay. Now, if the application were complete before the resolution passed, am I right, they can't then use the resolution to deny the application for an application that's already complete before the resolution is passed. Is that correct? Yes. That is a general statement of the law. But Your folks took the position his application was incomplete because there were some typographical errors in it. Well, more than typographical errors. And a typographical error was extremely important. I mean, to a county which is intent on preserving its land, it needs to know do you have 38 parcels or do you have 39 parcels. And until he corrected the typo. Why isn't that just a mistake rather than an incompletion? It seems to me incomplete is when you, there's a blank and you haven't filled it in. Something like this which is ambiguous or an error that there is a separate procedure where this kind of thing can be corrected. It doesn't bear on the completeness, but. Well, but it does bear on completeness because the map, the number of parcels you're going to create, is essential to the process of the application. I mean, that's probably the most important thing in the map is how many parcels are you creating. That was what was the big problem for Calusa, was the density of this. Isn't there a procedure where they could call him up, the planning people, and say I can't tell if you need 38 or 39, come back and fix it. Isn't there a procedure for that? There's an informal procedure. I mean, the MAP Act is very generalized. You're talking about the Permit Streamlining Act. And it's very generalized. Yes, can the county do that? Certainly. Well, he corrected that before the resolution was adopted. He corrected that on February the 16th. He did. He did. But if his theory is that this resolution was passed to target his land, if that resolution had been intended to target his land, it would have been passed on February 6th before the due date of the determination of completeness. Well, let me tell you what I'm getting at. Let's suppose just for the sake of discussion that the resolution should not have been applied to him because his application was complete and he got in under the wire before the resolution passed. Let's just say that for the sake of discussion. Would there be other reasons to uphold what the county did? Yes. What are those other reasons? Those reasons are the reasons behind the resolution. If you look at the general plan as a whole, it said we need 30 acres to preserve farmland in Colusa County. We should discourage, not even discourage, strictly prohibit nonagricultural parcels. Mr. Claxton's theory was that, hey, I'm telling you I'm going to farm this land, so therefore, my 39 parcels are not nonagricultural. They're agricultural. But that wasn't part of the plan. The plan said 30 acres, you need 30 to 40 for nuts. So it was incompatible with the plan, what he was planning to do with his acreage. He could have planned, he could have farmed for 5 years, 10 years, but he admitted he was thinking of selling parcels to finance other parcels. Obviously, when his mother died, it was going to be given to somebody. He wouldn't say to whom. He wouldn't say how many people. He wouldn't say how many people he was going to continue to farm as a unit when other people came into possession of the land. So his intent to farm dropped out of the equation as soon as he would sell a piece of property. His theory was that zoning would protect the agricultural nature of the parcels if they were sold, but zoning can only go so far and has to be operated with the general plan. You can zone something for 10 acres and say it's still agricultural. Somebody can come in, they're allowed under the zoning code to put up a home. So they put up a home, and if over time 39 parcels are sold, 39 homes will go up. And then it was the county's experience, the county's experience through a lot of testimony in these hearings, and he had three of them, that people were moving in, buying these ranchettes, and then abandoning the land. Once that land was lost to agriculture, it was gone. So under the general plan as it was, his application would have been denied. The resolution was not a change in the fundamental part of the general plan. It was a restatement of what was in there, and that was pretty much the 108 Holdings case. It was just a restatement of what was in there, and it was just an implementation of the goals and the objectives of the general plan. And I think my time is up. Roberts. Thank you very much, Mr. String. You'll have three minutes left on rebuttal. Good morning. May it please the Court. My name is Kara Uweta for Daniel Claxton. Your Honors, the county continues with its arguments about the importance of agriculture to Colusa County. We do not dispute that or disagree that agriculture is an important industry and the prime industry in Colusa County. However, that fundamentally is not what this case is about. This case was brought to the District Court on a written mandate pursuant to California Code of Civil Procedure, Section 1094.5. The District Court could have ruled in Mr. Claxton's favor for any of three separate and independent reasons. One, if the county exceeded its jurisdiction. Two, if the county denied Mr. Claxton a fair hearing. And three, if the county prejudicially abused its discretion. And the District Court found that the county did all three of those things and ruled in favor of Mr. Claxton. The county, however, continues to try to stay away from these legal issues and the legal standard and instead stress the importance of agriculture and the policy implications behind its decisions. And that is the wrong way to look at this case, because the case is rooted in these legal standards and not in the importance of agriculture to Colusa. Well, the legal standards have to be applied to something. And the something that they're being applied to is the county's decision to disallow the request for the subdivision of these parcels. And it did so based on the inconsistency of the proposal with the general plan, and it had a bunch of hearings. So what specifically, in your view, is wrong with the reasons that were given, that is, inconsistency with the general plan, apart from the resolution? Almost all the reasons have nothing to do with the resolution per se. They were rooted in the general plan, and you had all these hearings. So specifically what went wrong? Sure. Judge Graber, there were four findings that the county adopted. The fourth finding was specifically rooted in Resolution 07-010 concerning inconsistency with the general plan. But when Ms. Graber said that the subdivision was not based on any substantial evidence in the record, they were based on findings that they made concerning, quote-unquote, non-agricultural families moving in. There was no evidence in the record, and Mr. Claxton provided evidence to the contrary, that he would sell the parcels, that they would be converted into ranchettes, or that he would stop farming those parcels once they were subdivided. But specifically, when he submitted his application to the county, his application was consistent with the general plan. And there is not a 30-acre minimum, or there was not a 30-acre minimum in the general plan at the time of submittal. The general plan said that there were 10-acre minimums, and they were to be agricultural parcels. The prohibition was on 10-acre parcels that were non-agricultural, but there was nothing in the application or in the record to support an inference, other than the resolution, that Mr. Claxton's parcels would be non-agricultural parcels. So really, from your answer, I'm taking this to be, at bottom, a substantial evidence case. What was the evidence to support what the county did? It's partially a substantial evidence case, but really, if we back up a minute, and we go back to some of the timing issues that were discussed earlier, the timing issues really drive the rest of the case, because on the date, again, the date the application was submitted, the application was consistent with the general plan. There were 10-acre minimums. There is some sort of cautionary language in the general plan concerning wanting to perhaps have larger sizes of parcels, but there's nothing in the general plan that specifically says that. And so to deem the application inconsistent with the general plan is inconsistent with the law at the time Mr. Claxton's application should have been considered complete, because the application was complete when it was submitted. He had filled out the entire form. He answered all of the questions. There was a minor typographical error that the county now seems to make a big issue out of. It was minor. The county had clarifying questions to ask. That was fine. The county could have asked clarifying questions, and should have. But the application, the time of submittal was complete. And on that date, in February of 2007, when it was submitted, up until the 30th day on February 9th, 2007, that's the relevant time period. And all of the laws and regulations and resolutions that were in effect at that time should have applied to this application. And if that was the case, then Resolution 07-010 would have absolutely no bearing on the consideration of Mr. Claxton's application. And under the Permit Streamlining Act, that's exactly what should have happened. But instead, because the county dragged out its decision making on the completeness determination, decided months later for no apparent reason that the application was suddenly complete after it had adopted the resolution, then it could rely on this resolution that it had adopted in giving itself much more credence to say this application is now all of a sudden inconsistent with the general plan. And Mr. Claxton all along throughout the hearing process and the application process was treated unfairly as we have briefed. Other properties right around Mr. Claxton's property were granted 10-acre parcels. I wonder if you would talk about sort of generally their basic policy argument, which is if he can divide this thing into 35, 39 parcels basically for city people who want to have a country home, you're going to destroy the agricultural nature of the county. That's the basic nut of their argument. What do you say to that? That's the basis of their argument. But the county also ignores something that's really important that is also contained in their own codes and standards, which is that the allowable uses for property that is in the agricultural zone, agricultural designation and is zoned exclusive agriculture, the uses are really limited. Mr. Claxton did not propose to put any structure on any of these subdivided parcels. He didn't ask to put any homes. He didn't ask to put any roads. He didn't ask to put anything up on these parcels that he thought to be subdivided. Well, then if he's not going to make any change, what's the point, I guess? So dividing something into parcels has the legal effect of enabling what that is different than what existed before? Transfer of a smaller parcel to someone else, for example? It does enable transfer. And as Mr. Claxton said in his application, he was wanting to subdivide them for long-term estate planning purposes. The way you're describing it, it's like nothing would change. So if nothing would change, presumably he wouldn't care. So it seems to me that as just a matter of both legal potential and logic, the subdivision has some meaning going forward. And so for me, you know, coming to terms with that would be helpful to me, how you see the record as to what is the likely future of these smaller parcels or potential future of these smaller parcels. Sure. And as Mr. Claxton explained to the county, he sought to subdivide for two primary reasons. One, for long-term estate planning purposes, which, you know, basically is what it sounds like, which is so that somebody can basically divide property up and have it in separate ownership for long-term estate planning purposes. And secondly, he explained to the county that he believed it would be easier to get financing for the smaller parcels. But fundamentally, even though they were going to be in smaller parcels and bigger than the could only be realized upon separate actions taken sometime in the future to have structures put on them. So is it your view that the county can't look to the future, that they just have to say what's going to happen in the next 120 days, that they can't look down the road when they're making a decision? No, it's not that the county can't look down the road or obviously forecast what they'd like their own future to look like. It's that the county needs to have substantial evidence and needs to have some reason rooted both in the evidence and in the law to make this decision. We're not contending that the county had to approve the application necessarily, but that Mr. Claxton was due a fair hearing based on evidence in the record that was before it and really to give him a fair shake. What specifically is your client talking about in terms of estate planning? It's unclear to me how estate planning is different if you have, for example, 500 acres in one parcel or 500 acres in 100 parcels that have X value. What does the record show is different about his estate planning given those realities? Your Honor, I don't know if the record actually has any specific evidence as to the reality concerning long-term estate planning. That was not an issue in particular. Well, it was his primary reason, and if it's just – if it's not explained, I mean, I guess I don't – it doesn't seem self-evident to me what would be different. Well, Your Honor, I think if the Court takes a look at the Pescalito case, the Pesca-Sosalito case, it discusses the transfer of property from one generation to the next and how the Subdivision Map Act actually requires subdivisions if the – if a bigger piece of property is going to be held under a separate ownership by different people. And so in order to effectuate that type of transfer, the Court said a map is actually required. So he had 39 heirs – 39 heirs? Wasn't he trying to subdivide it into 39 pieces? 39 pieces, correct. Right. So is there evidence? Oh, heirs. I'm sorry, is that what you said? Yes. No, it's – it's not necessarily – they're not – there aren't necessarily 39 heirs to pass the property on to. But again, that is not an issue that was explored specifically in the record in terms of how many pieces of property were needed for who and for what purpose. So, Your Honors, I think I've hit upon – let me touch real briefly on the – on the standard of review that the county touched on. I would point this case to the City of Walnut Creek v. County of Contra Costa case at 101 Cal. Up 3rd, 1012, which talks about the substantial evidence standard of review and resolving all conflicts in favor of the prevailing party. I think, Your Honors, I have touched upon the three issues that we believe form the crux of this case, which is that under 1094.5, the county both denied Mr. Claxon a fair hearing, prejudicially abused its discretion, and exceeded its jurisdiction. The county deemed Mr. Claxon's application incomplete when it really was complete. The county unlawfully interpreted its general plan, did not actually interpret it and effectively amended it by Resolution 07-010, which led the county to take action to deny the application based on that resolution, denied Mr. Claxon a fair hearing, did not treat him similarly to other property owners in the vicinity, and finally lacked substantial evidence to make findings. So if Your Honors have no other questions, I'll submit. Thank you. Ms. Guetta, thank you very much. Ms. Stringer, back to you. Thank you. I think, Judge Graber, you've hit the nail on the head. We have to look at the ultimate purpose of this division into 39 lots. Long-term estate planning, it's a common-sense thing. He wanted to make the land more sellable, more financially advantageous by dividing it, because there's a saying, scratch a developer — I'm sorry, scratch a farmer and you'll find a developer, because in these rural California counties, the value of land as agriculture is far overshadowed by its value as these small 10-acre homeowners. Mr. Claxon had not one but three fair hearings. He had more than most of the people get, even the long, long-term residents who he thinks he's being discriminated against in favor of unfairly. We can never forget that the Subdivision Act acts as the purpose of subdividing is sale, financing or leasing. And Mr. Claxon has said, I may have to sell, I may have to finance. Well, let's say he finances and the bank forecloses. I can guarantee you the Bank of America is not going to be farming that land. And his 10-acre parcels, the 37 of them out there, that's his vision of the future. That's what he wants. That is the ultimate use. That is his plan. It is not Colusa County's plan. And 100 years from now, 200 years from now, who knows what Colusa County will look like. Maybe it will look like Sacramento County. But that's its decision. It is not Mr. Claxon's decision. He cannot start the process by filing a MAP. The 10-acre minimum was not a guarantee. It was a floor. His project, taken as a whole, was not consistent with the general plan. And the district court did not make the correct decision. And the district court's granting of the petition should be challenged and the petition should be denied. Any questions? I don't think so. Thank you, Mr. Zuetta. Thank you. Thank you, too. The case just argued is submitted.
judges: Silverman, Graber, Cjj Lynn (N. Texas), Dj